Vincent F. Papalia, Esq.
James H. Forte, Esq.
Mark A. Roney, Esq.
**SAIBER LLC**
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311
(973) 622-3333

**- and -**

Michael W. Moskowitz, Esq. (admitted *pro hac vice*)
Ari J. Glazer, Esq. (admitted *pro hac vice*)
**MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.A.**
800 Corporate Drive, Suite 500
Fort Lauderdale, Florida 33334
(954) 491-2000

*Attorneys for Coastal Marina, LLC*
*and Coastal Development, LLC*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>TCI 2 HOLDINGS, LLC, *et al*.,<br><br>        Debtors. | Case No. 09-13654 (JHW)<br>(Jointly Administered)<br><br>Chapter 11<br><br>Honorable Judith H. Wizmur |
| COASTAL MARINA, LLC and COASTAL DEVELOPMENT, LLC,<br><br>        Plaintiffs,<br>v.<br><br>TRUMP MARINA ASSOCIATES, LLC d/b/a TRUMP MARINA HOTEL AND CASINO, TRUMP ENTERTAINMENT RESORTS, INC., DONALD J. TRUMP, MARK JULIANO, ROBERT M. PICKUS, JOHN P. BURKE, TRUMP PLAZA ASSOCIATES, LLC d/b/a TRUMP PLAZA CASINO RESORT, TRUMP TAJ MAHAL ASSOCIATES, LLC d/b/a TRUMP TAJ MAHAL CASINO RESORT, ABC CORPORATIONS 1-100 and JOHN DOES 1-100,<br><br>        Defendants, | Adversary Case No. 09-02120 (JHW)<br><br>**FIRST AMENDED ADVERSARY COMPLAINT TO RECOVER PROPERTY AND FOR DECLARATORY AND OTHER RELIEF** |

and

FIDELITY NATIONAL TITLE INSURANCE
COMPANY,

Nominal Defendant.

Plaintiffs Coastal Marina, LLC (hereinafter "Coastal Marina") and Coastal Development, LLC (hereinafter "Coastal Development" and with Coastal Marina collectively referred to as the "Coastal Parties"), through their undersigned attorneys, hereby allege for their *First Amended Adversary Complaint to Recover Property and for Declaratory and Other Relief* against defendants Trump Marina Associates, LLC d/b/a Trump Marina Hotel and Casino (hereinafter "Trump Marina"), Trump Entertainment Resorts, Inc. (hereinafter "Trump Entertainment")**,** Donald J. Trump, Mark Juliano, Robert M. Pickus, John P. Burke, Trump Plaza Associates, LLC d/b/a Trump Plaza Casino Resort (hereinafter "Trump Plaza"), Trump Taj Mahal Associates, LLC d/b/a Trump Taj Mahal Casino Resort (hereinafter "Trump Taj Mahal"), ABC Corporations 1-100 and John Does 1-100, and nominal defendant Fidelity National Title Insurance Company, as follows:

## <u>INTRODUCTION</u>

1.    This action is about a scheme hatched by Donald J. Trump and his associates, in conjunction with his friend Andrew Beal, to sabotage the sale of the Trump Marina Hotel and Casino to the Coastal Parties, steal a **$15,000,000** deposit paid by the Coastal Parties, and force Trump Entertainment, Trump Marina and other affiliates into bankruptcy so Trump an his associates could personally enrich themselves.

2.      Plaintiffs Coastal Parties seek redress based upon fraudulent and calculated conduct by defendant Donald J. Trump and other individuals whose actions he directed and companies that he controlled that induced the Coastal Parties to make **$17,000,000** in deposits and incur millions of dollars of costs and expenses toward the purchase of the Trump Marina Hotel and Casino (hereinafter the "Casino") while, unbeknownst to the Coastal Parties, Mr. Trump and other defendants intended to: (i) strip the Casino of its valuable customers and key personnel; (ii) destroy its image with its potential and current patrons; (iii) let the Casino fall into a complete state of disrepair such that no lender would ever finance its purchase; (iv) cause the Casino to lapse into bankruptcy; and, (v) attempt to repurchase the Casino in bankruptcy for far less than its fair market value.

3.      The specific fraudulent misrepresentations and omissions of defendants include their unequivocal statements that they would maintain the Casino in good repair and condition from the date of the parties' execution of the Asset Purchase Agreement through the closing of its purchase and complete substantial and necessary capital improvements, and had the ability, financial or otherwise, to perform their obligations under the Asset Purchase Agreement.  These defendants made these misrepresentations and omissions, or caused these misrepresentations and omissions to be made, with the intent to induce the Coastal Parties to execute the Asset Purchase Agreement and pay an initial deposit of **$15,000,000** to an escrow agent.  Compounding their unlawful acts, defendants continued to make these and other misrepresentations (along with failing to cure the omissions), and conspired with his friend, Andrew Beal, to induce the Coastal Parties to execute a First Amendment to the Asset Purchase Agreement under which the

Coastal Parties agreed to release their **$15,000,000** deposit to Trump Marina and pay an additional $2,000,000 deposit to an escrow agent.

4.      In addition to their fraud, defendants Trump Marina and Trump Entertainment materially breached several covenants of the Asset Purchase Agreement that required them to maintain the Casino as an upscale, luxurious property, to strive to maintain current customers and attract new customers, and to retain their key employees. Defendants Donald J. Trump, Mark Juliano, Robert M. Pickus, John P. Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 also engaged in an unlawful conspiracy to tortiously interfere with the contractual rights of the Coastal Parties by diverting business from the Casino to other casinos owned and/or controlled, directly or indirectly by Trump Entertainment, including, but not limited to, Trump Plaza and Trump Taj Mahal, driving down the value of the Casino thereby preventing the Coastal Parties from purchasing it, and attempting to seize ownership and control of the Casino in subsequent bankruptcy proceedings for the their own personal benefit.

5.      As a direct and proximate result of the continuing fraud, breach of contract, tortious interference and other tortious conduct by defendants and others described herein, the Coastal Parties are entitled to rescind the Asset Purchase Agreement, the return of their initial **$15,000,000** deposit plus interest, the release from escrow of their additional **$2,000,000** deposit plus interest, compensatory and consequential damages (including, but not limited to, consulting, architectural, engineering and legal fees and other costs and expenses, in excess of **$6,000,00**, incurred in connection with the Asset Purchase Agreement and First Amendment) and punitive damages.

## PARTIES

6.      Plaintiff Coastal Marina is a limited liability company organized and existing under the laws of the State of New Jersey with a principal place of business at 1 East 57th Street, New York, New York.

7.      Plaintiff Coastal Development is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business located at 1 East 57th Street, New York, New York.

8.      Defendant Trump Marina is a limited liability company organized and existing under the laws of the State of New Jersey with a place of business located at Huron Avenue and Brigantine Boulevard, Atlantic City, New Jersey. Trump Marina does business as the Trump Marina Hotel and Casino.

9.      Defendant Trump Entertainment is a corporation organized and existing under the laws of the State of Delaware with a place of business located at 15 South Pennsylvania Avenue, Atlantic City, New Jersey.  Trump Entertainment is a holding company that owns the limited liability membership interests of Trump Marina and two other limited liability companies that own Atlantic City casinos, Trump Taj Mahal Associates, LLC and Trump Plaza Associates, LLC.

10.     Defendant Donald J. Trump (hereinafter "Trump") was, at all relevant times up to several days before the bankruptcy filing, the Chairman of the Board of Trump Entertainment, which has a place of business located at 15 South Pennsylvania Avenue, Atlantic City, New Jersey.  Trump was the architect of the scheme to cause the Casino to fall into a state of disrepair and lapse into bankruptcy, effectively preventing Coastal from obtaining the financing necessary to complete its purchase and affording

Trump an opportunity to purchase the Casino in subsequent bankruptcy proceedings for far less than its fair market value.

11.    Defendant Mark Juliano (hereinafter "Juliano") is a Director and the Chief Executive Officer of Trump Marina and Trump Entertainment.  Juliano was one of the primary persons with whom the Coastal Parties negotiated the Asset Purchase Agreement and First Amendment to the Asset Purchase Agreement and a participant in Trump's fraudulent scheme.

12.    Defendant Robert Pickus (hereinafter "Pickus") is the Chief Administrative Officer and General Counsel of Trump Marina and Trump Entertainment, which has a place of business located at 15 South Pennsylvania Avenue, Atlantic City, New Jersey.  Pickus was another one of the primary persons with whom the Coastal Parties negotiated the Asset Purchase Agreement and First Amendment to the Asset Purchase Agreement and a participant in Trump's fraudulent scheme.

13.    Defendant John P. Burke (hereinafter "Burke") is Chief Financial Officer, Executive Vice President and Treasurer of Trump Marina and Trump Entertainment.  Burke was also one of primary persons who participated in negotiations with the Coastal Parties over the Asset Purchase Agreement and First Amendment to the Asset Purchase Agreement and a participant in Trump's fraudulent scheme.

14.    Defendant Trump Plaza is a limited liability company organized and existing under the laws of the State of New Jersey with a place of business located at Mississippi Avenue and Boardwalk, Atlantic City, New Jersey.

15.    Defendant Trump Taj Mahal is a limited liability company organized and existing under the laws of the State of New Jersey with a place of business located at 1000 Boardwalk, Atlantic City, New Jersey.

16.     Defendants John Does 1-100 are certain currently unknown officers or employees of the defendants and/or their affiliates who engaged in the fraudulent and tortious conduct alleged herein.

17.     Defendants ABC Corporations 1-100 are certain currently unknown corporations who engaged in the fraudulent and tortious conduct alleged herein and also may have received and/or are in possession of the sums comprising the $15,000,000 initial deposit.

18.     Nominal Defendant Fidelity National Title Insurance Company (hereinafter "Fidelity National") has a place of business located at 1 Park Avenue, Suite 1420, New York, New York.  Fidelity National is named as a nominal defendant herein because it is the escrow agent and currently in possession of the $2,000,000 deposit made under the First Amendment to the Asset Purchase Agreement.

### JURISDICTION, VENUE AND STATUTORY AUTHORITY

19.     This adversary proceeding is brought in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure.

20.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

21.     The venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

22.     Counts I through IV and Counts VII through IX are non-core proceedings related to the jointly administered bankruptcy matters and Counts V and VI are core proceedings pursuant to 28 U.S.C. § 157(b)(2) (A), (E), and (N).

## FACTUAL BACKGROUND

### A.      The Chapter 11 Filings

23.      From 2005 through February 14, 2009, Trump served as Chairman of the Board of Directors of Trump Entertainment.  On February 14, 2009, Trump resigned as Chairman.

24.      On or about February 17, 2009 Trump Marina filed a petition under Chapter 11 of the Bankruptcy Code and the matter was assigned Bankruptcy Case No. 09-13662.

25.      On or about February 17, 2009, Trump Entertainment filed a petition under Chapter 11 of the Bankruptcy Code and the matter was assigned Bankruptcy Case No. 09-13655.

26.      On or about February 17, 2009, Trump Plaza filed a petition under Chapter 11 of the Bankruptcy Code and the matter was assigned Bankruptcy Case No. 09-13661.

27.      On or about February 17, 2009, Trump Taj Mahal filed a petition under Chapter 11 of the Bankruptcy Code and the matter was assigned Bankruptcy Case No. 09-13660.

28.      On February 18, 2009, this Court entered an order providing for the joint administration of Trump Marina's, Trump Entertainment's, Trump Plaza's and Trump Taj Mahal's cases along with those of TCI 2 Holdings, LLC (Case No. 09-13654: the Lead Case), Trump Entertainment Resorts Holdings, L.P., Trump Entertainment Resorts Funding, Inc., Trump Entertainment Resorts Development Company, L.P., TER Management Co., LLC and TER Development Co., LLC.

29.     Trump Marina has remained in possession of its assets, including the Purchased Assets (as defined below), and has continued to operate the Casino as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

30.     No Order has been entered by the Bankruptcy Court assuming or rejecting the Asset Purchase Agreement or authorizing its purported termination.

**B.      The Asset Purchase Agreement and
The Representations Made Therein**

31.     The Coastal Parties, Trump Marina and Trump Entertainment entered into the Asset Purchase Agreement as of May 28, 2008 (hereinafter the "Agreement"). Pursuant to Articles 1 and 2 of the Agreement, Trump Marina agreed to sell and Coastal Marina agreed to buy the Casino, all cash and cash equivalents located at the Casino at the time of transfer and various other property related to the business of Trump Marina (hereinafter the "Purchased Assets") for the sum of Three Hundred and Sixteen Million Dollars ($316,000,000), plus or minus certain agreed upon adjustments to be determined at closing (hereinafter the "Purchase Price").

32.     Pursuant to Section 2.2 of the Agreement, simultaneously with the execution and delivery of the Agreement, Coastal Marina deposited $15,000,000 with nominal defendant Fidelity National Title Company in accordance with an escrow agreement executed and delivered by Coastal Marina, Trump Marina and it (hereinafter the "$15,000,000 Initial Deposit").

33.     Article IV of the Agreement provides that the closing of the transactions contemplated by the Agreement, including the purchase and sale of the Purchased Assets (hereinafter the "Closing"), shall take place on the third business day following the satisfaction or waiver of the required conditions in Article VIII (hereinafter the "Target

Closing Date") but no later than the earlier of the twenty-first day after the Target

Closing Date and the Outside Date, which was defined as nine (9) months after the date

of the Agreement, which may be extended by Coastal Marina for two additional months,

so long as certain provisions were met or diligently being pursued.

34.    In an attempt to ensure that Trump Marina and Trump Entertainment

maintained the Casino as a luxurious resort between the date of the execution of the

Agreement and the Closing and/or did not divert customers or key employees to other

properties owned by affiliates of Trump Marina and Trump Entertainment, the Coastal

Parties required Trump Marina and Trump Entertainment to covenant and represent,

among other things, that they would maintain the Casino in its condition as of the date of

the Agreement and take all reasonable steps necessary to ensure that Trump Marina

maintained its customer relationships and key employees.

35.    Specifically, in Section 7.1(a) of the Agreement, entitled "Conduct of

Business of Seller," Trump Marina and Trump Entertainment covenanted and represented

that, during the period from the date of the Agreement and continuing until the earlier of

the termination of the Agreement or the Closing, that they would "carry on [Trump

Marina's] business in the usual, regular and ordinary course in substantially the same

manner as previously conducted . . . and, to the extent consistent with the operation of the

Purchased Assets in the Ordinary Course of Business, use commercially reasonable

efforts consistent with past practices and policies to preserve intact its present business

organization, keep available the services of its present key employees and preserve its

relationships with customers . . . ."

36.    Similarly, in Section 7.1(a)(ix) of the Agreement, Trump Marina and

Trump Entertainment covenanted and represented that, during the period from the date of

the Agreement and continuing until the earlier of the termination of the Agreement or the

Closing, would not "fail to maintain the [Casino] in its current repair and condition in all

material respects, ordinary wear and tear excepted."

37.     In Section 7.4(a) of the Agreement, entitled "Maintenance of Assets;

Budgeted Capital Expenditures; Ownership of Purchased Assets," Trump Marina further

covenanted and represented that, during the period from the date of the Agreement, it

would maintain the Casino "in the Ordinary Course of Business and consistent with past

practice, ordinary wear and tear excepted" and would "make the budgeted capital

expenditures of $5.5 million as set forth in Section 7.4 of the Seller Disclosure Letter

within the time periods and amounts indicated thereon."   Among the budged capital

expenditures identified in Section 7.4 were to replace dampers throughout the Casino to

improve air flow, upgrade the fire and life safety alarm system, repair the garage

(including the floors), repair the Marina bulkhead and repair the roof.

38.     Under the heading of "Additional Conditions to Obligations of Buyer,"

Section 8.2 of the Agreement provides that "[t]he obligation of Buyer to effect the

Closing is subject to each of the following conditions on or prior to the Closing Date . . .

."   One of the "following conditions" to Coastal Marina's obligation to close the

transaction is that Trump Marina "shall have performed in all material respects all

covenants, agreements and obligations required to be performed by it under this

Agreement at or prior to the Closing," including, but not limited to, the covenants,

agreements and obligations set forth in Sections 7.1 and 7.4 of the Agreement.

C.     **Trump Formulates His Plan To Prevent The Coastal Parties From Purchasing The Casino**

39.     While negotiating the Asset Purchase Agreement, the Coastal Parties began discussions with Trump Entertainment management about forming a larger business relationship.  As part of those discussions the Coastal Parties disclosed to a number of the defendants their business plan for the Trump Marina and other properties, including their plans to rebrand a number of casino properties under a Caribbean theme. On February 21, 2008, Juliano, Pickus and other Trump Entertainment executives flew with representatives from the Coastal Parties to Biloxi, Mississippi to tour a potential casino site.  During the trip to Biloxi, the Coastal Parties shared details of their business plan that included the Caribbean-themed concept for the Casino.

40.     In or about October, 2008, Richard Fields, a principal of the Coastal Parties, disclosed to Trump the Coastal Parties' intention to completely change the Casino's image, convert the Casino into a Jimmy Buffet Margaritaville themed gaming facility, and expand the Casino.

41.     Expressing interest in the Coastal Parties' plans, Trump asked Mr. Fields whether he could view the Coastal Parties' scale models of the proposed Margaritaville casino, which were located at the Coastal Parties' principal place of business.  Mr. Fields agreed.

42.     On October 24, 2008, Trump came to the Coastal Parties' principal place of business and inspected the scale models, renderings and other architectural and design materials relating to the Coastal Parties' plans to renovate and reposition the Casino, including their proposed business plan that reflected the anticipated substantial profitability that they could achieve through the proposed conversion and expansion of

the Casino utilizing the Caribbean-themed Margaritaville concept.  Mr. Fields also explained to Trump the Coastal Parties' marketing strategy relating to the proposed Jimmy Buffet Margaritaville casino.  Throughout the meeting, Trump expressed interest and enthusiasm over the Coastal Parties' plans.

43.     Indeed, Mr. Trump was so excited about the concept, that he asked to invest in the Coastal project by "rolling over" the $16 million he was due to receive from the $316 million proceeds that Trump Marina and Trump Entertainment were to receive from the sale of the Casino to the Coastal Parties.  Mr. Trump then apparently decided to take advantage of that opportunity for himself, as described in more detail below.  See Section (J).

### D.     The First Amendment

44.     Upon information and belief, the dire, but undisclosed, financial situation of Trump Entertainment and Trump Marina reached a critical point in the Fall of 2008. Faced with a shortage of cash, a continuing decline in gaming revenue and significant debt service payments coming due, Trump Entertainment began the process to prepare bankruptcy filings for itself and its affiliated entities.

45.     Upon further information and belief, prior to October 28, 2008 the defendants made the decision that Trump Entertainment, Trump Marina and their affiliated entities would file for bankruptcy protection.  However, prior to such filings, Trump Entertainment and Trump Marina were desperate for cash to maintain the ongoing façade that the defendants could continue to operate the Casino and Trump Entertainment's other casinos as first class establishments at a time when they were likely insolvent and losing significant sums of money each quarter.

46.     Defendants' need for cash was immediate and significant.  The defendants reported only having eighty-eight million dollars (**$88,000,000**) in cash and cash equivalents at the end of the third quarter of 2008.  Such an amount of cash was inadequate to continue to operate Trump Entertainment, Trump Marina and the affiliated companies and make the required fifty-three million dollar ($53,000,000) interest payment to certain bond holders due on December 1, 2008.

47.     To acquire the much needed cash without having to obtain a loan and incurring the related obligations of making interest and principal payments, Defendants embarked on their scheme to fraudulently wrest the $15,000,000 Initial Deposit from Coastal.

48.     Without disclosure of the dire financial situation of Trump Entertainment, Trump Marina and their affiliated entities, on or about October 28, 2008, the Coastal Parties, Trump Marina and Trump Entertainment entered into a First Amendment to the Agreement (hereinafter the "First Amendment").

49.     Paragraph 19 of the First Amendment provides that "[a]s expressly amended by this Amendment, all of the terms and provisions of the [Agreement] shall remain in full force and effect."  The First Amendment did not amend any of Trump Marina's and Trump Entertainment's covenants and representations under Sections 7.1, 7.4 or 8.2 of the Agreement.

50.     Pursuant to paragraphs 1 and 4 of the First Amendment, respectively, and in reliance upon Trump Marina's and Trump Entertainment's covenants and representations in the Agreement and concerning its financial ability to perform thereunder, among other misrepresentations, Coastal Marina agreed to cause the $15,000,000 Initial Deposit together with interest thereon to be released from escrow and

delivered to Trump Marina, and to provide an additional $2,000,000 to be held in escrow by Fidelity National Title Insurance Company (hereinafter the "$2,000,000 Subsequent Deposit").

51.    In further reliance upon, among other representations, Trump Marina's and Trump Entertainment's covenants and representations, the Coastal Parties agreed in the First Amendment that Section 9.3(a) of the Agreement, which authorized the return of the $15,000,000 Initial Deposit to Coastal Marina on certain conditions, would be revised to provide that the $15,000,000 Initial Deposit was "fully earned by [Trump Marina] and under no circumstances shall the Initial Deposit be returned to [Coastal Marina] . . . except in the event of actual fraud by [Trump Marina], [Trump Entertainment] or any of their Affiliates" and to delete the Coastal Parties' right to terminate and obtain the return of their $15,000,000 Initial Deposit in the event that a Catastrophic Market Material Adverse Effect (as defined in the Agreement) shall have been in effect.

52.    Paragraph 15 of the First Amendment also amended the definition of Outside Date to extend the date for the Closing.  Specifically, the definition of Outside Date was amended to mean "May 28, 2009, which may be extended by [Coastal Marina] for an additional two months" as long as Coastal Marina was in compliance with certain provisions of the Agreement and its other covenants, and subject to other conditions.

**E.    Defendants Enlist Additional Assistance in their Fraudulent Scheme**

53.    In connection with the negotiations regarding the First Amendment, the Coastal Parties received an unsolicited offer to finance their acquisition of the Casino from Andrew Beal (hereinafter "Beal") through one or more of the entities he owned and/or controlled: Beal Bank, Inc. (hereinafter "Beal Bank"), CSG Investments, Inc.

(hereinafter "CSG"), and CLG Hedge Fund, LLC (hereinafter "CLG" and with Beal,

Beal Bank and CSG collectively referred to as the "Beal Parties").

54.    Upon information and belief, Beal instructed the offer to be made at

Trump's direction.  As the owner of the entity holding a blanket first lien on all of the

Debtors' assets (and upon further information and belief, being a close personal friend of

Trump), Beal had a vested interest in ensuring that Trump Entertainment and Trump

Marina acquired the $15,000,000 Initial Deposit to ensure that the Debtors would

continue to operate - - and continue to pay their obligations to Beal Bank.

55.    After receiving the unsolicited offer for financing, the Coastal Parties

entered into good faith negotiations with CLG to obtain financing for its purchase of the

Casino.  These negotiations, in part, further induced the Coastal Parties into executing the

First Amendment.

56.    However, unbeknownst to the Coastal Parties, the Beal Parties never

intended to provide funding for the purchase.  Instead, they made the offer to finance the

Casino to further the defendants' efforts to induce the Coastal Parties to agree to release

the $15,000,000 Initial Deposit.   Once the First Amendment was signed and the

$15,000,000 Initial Deposit released, the Beal Parties' feigned interest in financing the

purchase of the Casino evaporated.

57.    Upon information and belief, at the time of the unsolicited offer, the Beal

Parties had knowledge of the dire financial situation the Debtors faced and the dramatic

diminution in value of the Casino and Trump Entertainment and Trump Marina's failure

to maintain and repair the Casino as required by the Agreement.  However, the Beal

Parties failed to disclose any of this knowledge to the Coastal Parties and the Beal

Parties' continued involvement in offering financing for the purchase of the Casino served no purpose but to further the fraud being perpetuated on the Coastal Parties.

### F.   Defendants Cause The Casino To Fall Into a State of Disrepair In Furtherance Of Their Fraudulent Scheme

58.   Within 30 days of signing the First Amendment, Trump Entertainment announced it would not make a $53 million interest payment on its bonds. Approximately 2 months later, Trump Entertainment and Trump Marina filed bankruptcy. Shortly thereafter, the Coastal Parties hired, among others, architects and engineers to inspect the Casino in connection with certain proposed renovations that the Coastal Parties intended to make post-Closing, and to assess the state of the facilities.

59.   As a result of these inspections, the Coastal Parties discovered that Trump Marina and Trump Entertainment had performed few, if any, of the repairs that were necessary to maintain the Casino in its condition as of the date of the Agreement and in the ordinary course of business consistent with their past practice or had not begun or failed to complete most of the capital projects identified in Section 7.4 of the Seller Disclosure Letter.

60.   Examples of the manner in which the defendants allowed the Casino to fall into a state of disrepair include, but are not limited to, (a) the failure to complete the planned replacement of the energy management system, which has resulted in the failure of the system to work properly and the lack of fresh air in the Casino; (b) windows leaking throughout the Casino; (c) inadequate air conditioning and no fresh air in the roof top units of the Crystal Tower, including an open air conditioning unit with two frozen coils and also air fans that are not moving; (d) the deterioration of the exterior soffits at the Crystal Tower, which exposes the tower to wind and bad weather; (e) original kitchen

equipment that has been removed and not replaced for the Marina Building; and (f) the air conditioning at the Casino was antiquated and had exceeded its useful life, resulting in numerous customer complaints and numerous hotel rooms that could not be booked, and in need of replacement.

61.     The work identified in Section 7.4 of the Seller Disclosure Letter that defendants failed to start and/or complete includes, but is not limited to, (a) repairs to the garage floors, (b) the upgrade of the fire and life safety alarm system, (c) repair to the Marina bulkhead, and (d) repairs to the roof and skylights.  Indeed, rather than repair the roof and skylights, Trump Marina resorted to using drip pans and placing plants underneath the leaks.

62.     In total, the cost of completing the necessary and ordinary maintenance of the Casino which defendants had neglected and ignored, along with the completion of the work identified in Section 7.4 of the Seller Disclosure Letter, is estimated to be no less than fifty million dollars **($50,000,000).**  Upon information and belief, the actual costs associated with the maintenance and repairs are likely to be as much as seventy five million dollars **($75,000,000)** to one hundred million dollars **($100,000,000)** once the full extent of the actual condition of the Casino can be determined.

63.     The failure of the defendants to have the required maintenance and repairs performed and to complete the work identified in Section 7.4 of the Seller Disclosure Letter has negatively impacted the Casino and its business reputation in the form of customer complaints, a diminished reputation as to its quality and responsiveness, and a general perception that the Casino is far from the "ultimate in comfort and style" as Trump Marina describes itself on its website.

64.     This negative impact on the Casino, and its reputation as the "ultimate in comfort and style," is readily apparent to anyone who sets foot into the Casino and has been acknowledged and publicly confirmed by various Casino employees and patrons.

**G.      The Defendants' Diversion of Casino Personnel and Business As Part Of Their Fraudulent Scheme**

65.     In addition to their failure to maintain the Casino and complete the work identified in Section 7.4 of the Seller Disclosure Letter, defendants also engaged in an intentional and surreptitious campaign to divert current and potential customers away from the Casino to the other hotels and casinos owned and/or controlled by affiliates of Trump Entertainment, Trump Plaza and Trump Taj Mahal.

66.     Defendants provided Trump Marina's existing customers, including its major customers ("High Rollers"), with credits and vouchers for free hotel rooms and other gratuities to other hotels and casinos owned and/or controlled by Trump Entertainment and its affiliates, including Trump Plaza and Trump Taj Mahal.

67.     Defendants also caused to be transferred key marketing and customer relations personnel from the Casino to other hotels and casinos owned and/or controlled by Trump Entertainment and its affiliates, including Trump Plaza and Trump Taj Mahal.

68.     Defendants' failure to maintain the Casino in a proper state of repair, and their unlawful scheme to divert customers and employees away from the Casino occurred during the time that Trump Entertainment was completing a $400 million addition to the Trump Taj Mahal.

**H.      Defendants' Knowing Concealments As Part Of Their Fraudulent Scheme**

69.     Before the execution of the First Amendment, defendants knew but failed to disclose that Trump Marina's and Trump Entertainment's financial condition had

taken a dramatic and irreversible turn for the worse -- which necessitated the filing of the instant bankruptcy proceedings less than four months after the execution of the First Amendment.

70.     Notwithstanding these defendants' knowledge that Trump Marina and Trump Entertainment were in dire financial straits, were incapable of performing the maintenance and repairs necessary to maintain the Casino, would continue to lose business and would ultimately file for bankruptcy, they represented, or caused representations to be made, to the Coastal Parties by entering into the Agreement, the First Amendment, and otherwise that they were capable of meeting their obligations under the Agreement, Seller Disclosure Statement, and other financial obligations affecting the Casino.  In fact, as a result of their diversion of business and their failure to maintain a first class facility, the Trump Marina's EBIDTA fell from **$26.6 million** at the time the Asset Purchase Agreement was signed to **$6.5 million** at the time Trump Entertainment and Trump Marina filed bankruptcy.

71.     Only one month after it executed the First Amendment, which expressly ratified all of the terms, provisions, covenants and representations of the Agreement, on or about November 28, 2008, Trump Entertainment announced that it would not be making its $53 million bond interest payment due December 1, 2008.

72.     On February 17, 2009, approximately two and one half months later, Trump Marina and Trump Entertainment filed for bankruptcy protection.

73.     The representations that Trump Marina and Trump Entertainment were capable of meeting their obligations under the Agreement were intentionally false and designed to induce the Coastal Parties to execute the First Amendment under which they released the $15,000,000 Initial Deposit, thereby effectively providing Trump

Entertainment, Trump Marina and their affiliated entities with desperately needed funds, which were plainly unable to obtain elsewhere.  Under the First Amendment the Coastal Parties also provided the $2,000,000 Subsequent Deposit and removed key provisions from the Agreement entitling them to a refund of the $15,000,000 Initial Deposit.

### I.    The Alleged Termination of the Agreement

74.    Upon learning of the manner in which Trump Marina and Trump Entertainment, among others, had not honored their covenants and representations, on May 1, 2009, the Coastal Parties sent their counsel a letter addressing their "serious and ongoing failures" to maintain the quality of the facilities of the Casino.

75.    Trump Marina and Trump Entertainment failed to acknowledge the existence of their failures as identified by the Coastal Parties. Thereafter, the Coastal Parties, through counsel, sent Trump Marina and Trump Entertainment a letter advising that the failures resulted in a breach of the Agreement and First Amendment and set forth the discovery of their fraud.

76.    Rather than attempt to cure the breaches or otherwise take action, by letter dated June 1, 2009, Trump Marina sent notice of its alleged "termination" of the Agreement under Section 9.1(b) thereof notwithstanding the fact that Coastal Marina had no obligation to close the transaction in view of Trump Marina's and Trump Entertainment's breach of their covenants, obligations and agreements in Sections 7.12, 7.4 and 8.2 of the Agreement.

77.    At the time Trump Marina purported to terminate the Agreement, the Coastal Parties had spent a significant amount of time, effort and resources in anticipation of purchasing the Casino and in preparation of re-branding it as a Jimmy Buffet Margaritaville themed gaming facility.  In fact, the Coastal Parties spent in excess of six

million dollars **($6,000,000)** for professional fees (for architects, engineers, etc.) in addition to the seventeen million dollars **($17,000,000)** in deposits paid.

### J.     Trump Reveals A Second Motive For His and the Other Defendants' Fraudulent Acts

78.     On or about July 28, 2009, the Coastal Parties filed the instant Adversary Complaint in the jointly administered Chapter 11 bankruptcy case captioned In re TCI 2 Holdings, LLC, et al., Case No. 09-13654 (JHW) against Trump Marina, Trump Entertainment, Juliano, Pickus, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 alleging, among other things, that they engaged in a conspiracy to defraud them and other tortious acts that resulted in the Coastal Parties' payment of the $15,000,000 Initial Deposit, $2,000,000 Subsequent Deposit and consulting, architectural, engineering and legal fees and other costs and expenses.

79.     On or about August 3, 2009, Trump Entertainment, Trump Entertainment Resorts Holdings, L.P., a Delaware limited partnership holding the stock of Trump Entertainment (hereinafter "Trump Holdings"), BNAC, Inc., a Texas corporation and direct or indirect wholly-owned subsidiary of Beal Bank, and Trump entered into a purchase agreement (hereinafter "Trump Purchase Agreement")under which BNAC, Inc. and Trump agreed to make a joint capital contribution to Trump Holdings in the aggregate sum of $100 million in exchange for Trump Holdings (as reorganized) issuing partnership interests to BNAC, Inc. and Trump, and Trump Entertainment (as reorganized) issuing all of its common stock to Trump.  Upon Trump Entertainment's issuance of such stock, Trump would completely own and control Trump Marina, Trump Plaza and Trump Taj Mahal.

80.     On or about October 5, 2009, Trump Entertainment, Trump Holdings, BNAC, Inc., and Trump entered into an amended Purchase Agreement under which BNAC, Inc. and Trump amended the Trump Purchase Agreement to increase the amount of their joint capital contribution to the aggregate sum of $113.9 million (the "Amended Trump Purchase Agreement").

81.     On or about October 5, 2009, Trump caused the Debtors to file a Second Amended and Restated Disclosure Statement and Amended and Restated Joint Plan of Reorganization for Debtors' Joint Plan Under Chapter 11 of the Bankruptcy Code that seeks this Court's approval of the Amended Trump Purchase Agreement as amended.  In furtherance of Trump's effort to obtain the lowest possible price for the purchase of Trump Marina, the Amended and Restated Joint Plan of Reorganization disparagingly refers to the Casino as a "discontinued operation", a "cash drain" and states that its value is only $24 million.

82.     Upon information and belief, as part of Trump's scheme to retain ownership and control of the Debtors through these bankruptcy proceedings without making any payment to the holders of certain senior secured notes due 2015 issued by Trump Holdings and Trump Entertainment Resorts Funding, Inc. (the "Noteholders"), Trump entered into secret negotiations with the Beal Parties.  In furtherance of this then-secret agreement, Beal engaged the Noteholders in sham negotiations regarding a potential joint acquisition of the Debtors by the Noteholders or an agreement to modify the first lien position held by Beal Bank.

83.     To facilitate these sham negotiations, a meeting was organized to take place in Dallas, Texas on March 4, 2009 wherein counsel for the Noteholders and certain Noteholders met with Beal.  Upon information and belief, the Noteholders were unaware

that the night before the Noteholders' meeting with Beal in Texas, Beal had a clandestine meeting with Trump and his daughter, Ivanka Trump in Atlantic City, New Jersey, where, upon further information and belief, the agreement between Trump and Beal to acquire the Debtors through these bankruptcy proceedings, without any payment to the Noteholders, was finalized.

84.     Upon information and belief, Trump has developed plans to remodel the Casino in a Caribbean theme substantially similar to the proposed Jimmy Buffet Margaritaville gaming facility reflected in the Coastal Parties' business plan, and will thereby personally benefit if permitted to purchase the Casino to a far greater extent than if the Coastal Parties had purchased the Casino.

85.     Upon information and belief, Juliano, Burke and Pickus, and a family member of Pickus (Loretta Pickus), will be retained as officers, directors, employees or consultants of Trump Marina (as reorganized) and/or Trump Entertainment (as reorganized).  Under the Debtors' Second Amended and Restated Plan of Reorganization, Juliano, Pickus, Burke and Loretta Pickus each will each receive from Trump Marina (as reorganized) and/or Trump Entertainment (as reorganized) a severance benefit equal to one year's salary triggered upon any subsequent termination without cause or any diminution in job title or responsibilities.  Because the Coastal Parties did not intend to retain Juliano, Pickus or Burke as officers, directors, employees or consultants of Trump Marina, Juliano, Pickus and Burke will personally benefit if Trump is permitted to purchase the Casino to a far greater extent than if the Coastal Parties had purchased it.

## COUNT I

### (Fraud Based Upon Material Misrepresentations Against
Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke and John
Does 1-100)

86.    They repeat and reallege the allegations set forth in paragraphs 1 through

85 of the Complaint as if set forth at length herein.

87.    Trump Marina and Trump Entertainment made, and Trump, Juliano,

Pickus and Burke caused them to make, material misrepresentations of fact in the

Agreement, in the First Amendment and otherwise when they covenanted and

represented that they would (a) "carry on [Trump Marina's] business in the usual, regular

and ordinary course in substantially the same manner as previously conducted . . . and, to

the extent consistent with the operation of the Purchased Assets in the Ordinary Course of

Business, use commercially reasonable efforts consistent with past practices and policies

to preserve intact its present business organization, keep available the services of its

present key employees and preserve its relationships with customers; " (b) would

maintain the Casino "in the Ordinary Course of Business and consistent with past

practice, ordinary wear and tear excepted;" and (c) would "make the budgeted capital

expenditures set forth in Section 7.4 of the Seller Disclosure Letter within the time

periods and amounts indicated thereon."

88.    At the time Trump Marina and Trump Entertainment made, and Trump,

Juliano, Pickus and Burke caused them to make, these material misrepresentations, they

did so with the intention not to comply with them

89.    At the time Trump Marina and Trump Entertainment made, and Trump,

Juliano, Pickus and Burke caused them to make, these material misrepresentations, they

did so with the intent that Coastal Parties rely to their detriment upon them and with actual malice or a wanton and willful disregard of the harm to the Coastal Parties.

90.     In reasonable reliance upon these material misrepresentations, among other misrepresentations, the Coastal Parties entered into the Agreement and made the $15,000,000 Initial Deposit, and also entered into the First Amendment, made the $2,000,000 Subsequent Deposit, and agreed to release the $15,000,000 Initial Deposit to Trump Marina and waive any claim or right to the $15,000,000 Initial Deposit or its return.

91.     As a direct and proximate result of their reasonable reliance upon these misrepresentations, among other misrepresentations, the Coastal Parties have sustained substantial damages, including, but not limited to, the payment of the $15,000,000 Initial and $2,000,000 Subsequent Deposits and the cost of consultants, attorneys, architects and engineers, among other costs.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendants Trump Marina, Trump Entertainment, Trump, Juliano, Pickus and Burke as follows:

a.     For rescission of the Agreement and First Amendment;

b.     For compensatory damages;

c.     For the return of the $15,000,000 Initial Deposit;

d.     For the release of the $2,000,000 Subsequent Deposit to the Coastal Parties;

e.     For consequential and incidental damages;

f.     For punitive damages;

g.     For attorneys' fees and costs; and,

h.     For all other and further relief as the Court deems just and
equitable.

## COUNT II

**(Fraud Based Upon Material Non-Disclosures Against
Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke and John
Does 1-100)**

92.     They repeat and reallege the allegations set forth in paragraphs 1 through

91 of the Complaint as if set forth at length herein.

93.     During the negotiations leading up to the execution of the Agreement and

First Amendment, Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke

and John Does 1-100 failed to disclose to the Coastal Parties that Trump Marina's and

Trump Entertainment's financial situation was so dire and precarious that they could not

financially perform their obligations under the Agreement and that they intended to divert

key personal and business from the Casino to other casinos owned or controlled by

Trump Entertainment or its affiliates.

94.     Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke and

John Does 1-100 had a duty to exercise reasonable care to disclose the nature and extent

of their financial condition and the impact on their duty to perform their obligations under

the Agreement and also their intent to divert key personnel and business from the Casino

because, among other reasons, (a) such disclosure was necessary to prevent their

misrepresentations and covenants concerning their obligations to maintain the Casino in

good repair and condition and to preserve its relationships with customers and maintain

key employees from being untrue or misleading; and (b) they knew that the Coastal

Parties were relying upon their financial wherewithal and efforts to maintain current

business relationships and key employees, including High-Rollers, and that the Coastal Parties would expect the disclosure of such facts.

95.     In breach of their duty to the Coastal Parties, and with actual malice or a wanton and willful disregard of the harm to the Coastal Parties, Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke and John Does 1-100 knowingly failed to make these material disclosures.

96.     Unaware of these material non-disclosures by Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke and John Does 1-100, the Coastal Parties entered into the Agreement and made the $15,000,000 Initial Deposit, and also entered into the First Amendment, made the $2,000,000 Subsequent Deposit, and agreed to release the $15,000,000 Initial Deposit to Trump Marina and waive any claim or right to the $15,000,000 Initial Deposit or its return absent actual fraud on the part of Trump Marina, Trump Entertainment or their affiliates.

97.     As a direct and proximate result of their reasonable reliance upon Trump Marina's, Trump Entertainment's, Trump's, Juliano's, Pickus', Burke's and John Does 1-100's non-disclosures, among other non-disclosures, the Coastal Parties have sustained substantial damages, including, but not limited to, the payment of the $15,000,000 Initial and $2,000,000 Subsequent Deposits and the cost of consultants, attorneys, architects and engineers, among other costs.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendants Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke and John Does 1-100 as follows:

a.     For rescission of the Agreement and First Amendment;

b.     For compensatory damages;

c.       For the return of the $15,000,000 Initial Deposit;

d.       For the release of the $2,000,000 Subsequent Deposit to the Coastal Parties;

e.       For consequential and incidental damages;

f.       For punitive damages;

g.       For attorneys' fees and costs; and,

h.       For all other and further relief as the Court deems just and equitable.

## COUNT III

**(Material Breach of Contract Against Trump Marina and Trump Entertainment)**

98.     They repeat and reallege the allegations set forth in paragraphs 1 through 97 of the Complaint as if set forth at length herein.

99.     In Section 7.1(a) of the Agreement, Trump Marina and Trump Entertainment agreed that, during the period from the date of the Agreement and continuing until the earlier of the termination of the Agreement or the Closing, that they would "carry on [Trump Marina's] business in the usual, regular and ordinary course in substantially the same manner as previously conducted . . . and, to the extent consistent with the operation of the Purchased Assets in the Ordinary Course of Business, use commercially reasonable efforts consistent with past practices and policies to preserve intact its present business organization, keep available the services of its present key employees and preserve its relationships with customers . . . ."

100.    In Section 7.1(a)(ix) of the Agreement, Trump Marina and Trump Entertainment agreed that, during the period from the date of the Agreement and continuing until the earlier of the termination of the Agreement or the Closing, would not

"fail to maintain the [Casino] in its current repair and condition in all material respects, ordinary wear and tear excepted."

101.    In Section 7.4(a) of the Agreement, entitled "Maintenance of Assets; Budgeted Capital Expenditures; Ownership of Purchased Assets," Trump Marina further agreed that, during the period from the date of the Agreement, it would maintain the Casino "in the Ordinary Course of Business and consistent with past practice, ordinary wear and tear excepted" and would "make the budgeted capital expenditures set forth in Section 7.4 of the Seller Disclosure Letter within the time periods and amounts indicated thereon."

102.    Pursuant to Section 7.2 of the Agreement, Trump Marina and Trump Entertainment agreed that it would promptly notify the Coastal Parties in writing, and use commercially reasonable efforts to cure, "any event, transactions or circumstance, as soon as practicable after it becomes known to such party, that causes or will cause any covenant or agreement of Seller . . . under this Agreement to be breached in any material respect or that renders or will render untrue in any material respect any representation or warranty of Seller . . . contained in this Agreement."

103.    Trump Marina's and Trump Entertainment's continuing failure to maintain the Casino in the condition that existed as of the date of the Agreement, ordinary wear and tear excepted, to maintain its key employees and relationships with its customers, including High-Rollers, to perform the work set forth in Section 7.4 of the Seller Disclosure Letter, to notify the Coastal Parties of these failures, and to use reasonably commercial efforts to cure their failures constitute material breaches of their obligations under the Agreement and First Amendment.

104.    Trump Marina's and Trump Entertainment's transferring of key marketing and customer relations personnel from the Casino to the other hotels and casinos owned and/or controlled by Trump Entertainment and its affiliates, including Trump Plaza and Trump Taj Mahal constitute material breaches of their obligations under the Agreement and First Amendment.

105.    These material breaches by Trump Marina and Trump Entertainment relieve Coastal Marina from its obligation to purchase the Casino and entitle Coastal Marina to the return of the Initial and Subsequent Deposits, as well as damages including (but not limited to) the Coastal Parties' consulting, architectural, engineering and legal fees and other costs and expenses incurred in connection with the Asset Purchase Agreement and First Amendment.

**WHEREFORE**, plaintiff Coastal Marina hereby demands judgment in its favor and against defendants Trump Marina and Trump Entertainment as follows:

a.    For compensatory damages;

b.    For the return of the $15,000,000 Initial Deposit;

c.    For the release of the $2,000,000 Subsequent Deposit to the Coastal Parties;

d.    For consequential and incidental damages; and,

e.    For all other and further relief as the Court deems just and equitable.

## COUNT IV

### (Breach of Covenant of Good Faith and Fair Dealing Against Trump Marina and Trump Entertainment)

106.    They repeat and reallege the allegations set forth in paragraphs 1 through 105 of the Complaint as if set forth at length herein.

107.    In every contract governed by the law of the State of New Jersey, there is an implied covenant on the part of each party to the contract to act honestly and truthfully, as well as to deal with the other party or parties fairly and in good faith.

108.    The wrongful actions of Trump Marina and Trump Entertainment as to the Agreement and First Amendment described above breached the covenant of good faith and fair dealing.

109.    As a result of the Trump Marina's and Trump Entertainment's conduct, the Coastal Parties have suffered damages.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendants Trump Marina and Trump Entertainment as follows:

a.    For compensatory damages;

b.    For the return of the $15,000,000 Initial Deposit;

c.    For the release of the $2,000,000 Subsequent Deposit to the Coastal Parties;

d.    For consequential and incidental damages; and,

e.    For all other and further relief as the Court deems just and equitable.

## <u>COUNT V</u>

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

110.    They repeat and reallege the allegations set forth in paragraphs 1 through 109 of the Complaint as if set forth at length herein.

111.    The $2,000,000 Subsequent Deposit is currently being held in escrow by nominal defendant Fidelity National.

112.    Section 9.3(b) of the Agreement provides that the Coastal Parties maintain an interest in the $2,000,000 Subsequent Deposit until the Closing occurs or a transfer of the $2,000,000 Subsequent Deposit under Section 9.3 of the Agreement and First Amendment occurs.

113.    Section 9.3(b) of the Agreement further provides that Trump Marina is not entitled to the $2,000,000 Subsequent Deposit if Trump Marina, Trump Entertainment or any of their affiliates engages in actual fraud and/or if the Agreement and First Amendment are rejected in bankruptcy court.

114.    Trump Marina and Trump Entertainment have committed actual fraud against the Coastal Parties as described herein and, therefore, the Coastal Parties are entitled to the return of the $2,000,000 Subsequent Deposit pursuant to Section 9.3(b) of the Agreement.

115.    As a result, the $2,000,000 Subsequent Deposit does not constitute property of the estates of Trump Marina or Trump Entertainment and should be turned over and paid to the Coastal Parties.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendants Trump Marina and Trump Entertainment and nominal defendant Fidelity National as follows:

a.      For an Order declaring that the $2,000,000 Subsequent Deposit is not property of the estates of Trump Marina, Trump Entertainment or any of the Debtors in these jointly administered bankruptcy proceedings;

b.      For an Order authorizing and directing Fidelity National to release and deliver the $2,000,000 Subsequent Deposit to the Coastal Parties; and

c.      For all other and further relief as the Court deems just and equitable.

## <u>COUNT VI</u>

### (Declaratory Judgment Pursuant to 28 U.S.C. §2201 and
### 11 U.S.C. §§ 363 and 365)

116.    They repeat and reallege the allegations set forth in paragraphs 1 through 115 of the Complaint as if set forth at length herein.

117.    Trump Marina's purported termination of the Agreement and First Amendment was outside the ordinary course of the business of Trump Marina and Trump Entertainment and therefore required the approval of this Court under Section 363 of the Bankruptcy Code.  Without such approval, the purported termination is ineffective.

118.    In addition, or in the alternative, Trump Marina's purported termination of the Agreement and First Amendment, while Trump Marina and Trump Entertainment were in material breach thereof and did not have any ability to cure their breaches, constituted a *de facto* rejection of the Agreement and First Amendment.   Such an attempted rejection also required the approval of this Court under Section 365 of the Bankruptcy Code.   Without such approval, the purported termination is ineffective.  Accordingly, this Court should enter an Order authorizing and ratifying the *de facto* rejection.

119.    Based on Trump Marina's *de facto* rejection of the Agreement and First Amendment, the Coastal Parties are entitled to the return of the $2,000,000 Subsequent Deposit pursuant to Section 9.3(a) (ii) of the Agreement.

120.    As a result, the $2,000,000 Subsequent Deposit does not constitute property of the estate of Trump Marina or Trump Entertainment and should be turned over to the Coastal Parties.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against Defendants Trump Marina and Trump Entertainment and nominal defendant Fidelity National as follows:

a.    For an Order declaring that (i) the Agreement and First Amendment are deemed rejected under Section 365 of the Bankruptcy Code and (ii) the $2,000,000 Subsequent Deposit is not property of the estates of Trump Marina, Trump Entertainment or any of the other Debtors in these jointly administered proceedings;

b.    For an Order authorizing and directing Fidelity National to release and deliver the $2,000,000 Subsequent Deposit to the Coastal Parties; and

c.    For all other and further relief as this Court deems just and proper.

## COUNT VII

### (Constructive Trust against Trump Marina and ABC Corporations 1-100)

121.    They repeat and reallege the allegations set forth in paragraphs 1 through 120 of the Complaint as if set forth at length herein.

122.    Pursuant to section 541(d) of the Bankruptcy Code, property in which a debtor holds, as of the commencement of the case, only legal title and not an equitable interest becomes property of the estate only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

123.    Trump Marina has no legal or equitable claim to the $15,000,000 Initial Deposit as it obtained the $15,000,000 Initial Deposit through the fraud and deceit as alleged herein.

124.    As a matter of equity, Trump Marina holds the $15,000,000 Initial Deposit merely as a constructive trustee for the benefit of the Coastal Parties.

125.    To the extent that the $15,000,000 Initial Deposit, or any portion thereof, is no longer in the possession of Trump Marina and has been transferred to ABC Corporations 1-100, any legal or equitable claim those corporations may have is subject to the Coastal Parties' interests and subject to the constructive trust.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendant Trump Marina and ABC Corporations 1-100 as follows:

a.    For an order declaring that the sum of Fifteen Million Dollars ($15,000,000) plus any revenues, profits, properties and assets derived, directly or indirectly, by Trump Marina or ABC Corporations 1-100 from the receipt of the $15,000,000 Initial Deposit are being held in constructive trust for the benefit of the Coastal Parties and directing that these defendants be required to provide a full and detailed accounting to the Coastal Parties of all transfers, revenues, profits, properties and assets derived from the wrongdoing set forth in this Complaint;

b.    For an order directing Trump Marina or ABC Corporations 1-100 to disgorge the sum of Fifteen Million Dollars ($15,000,000) plus any revenues, profits, properties and assets derived from their receipt of the $15,000,000 Initial Deposit, directly or indirectly, to the Coastal Parties plus interest from the date(s) the $15,000,000 Initial Deposit was transferred to the Trump Marina and/or ABC Corporations 1-100; and,

c.    For all other and further relief as this Court deems just and proper.

## <u>COUNT VIII</u>

### (Tortious Interference with Contractual Rights Against Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100)

126.    They repeat and reallege the allegations set forth in paragraphs 1 through 125 of the Complaint as if set forth at length herein.

127.    Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100, and John Does 1-100 were aware of the existence of the Agreement,

First Amendment and the obligations of the Trump Marina and Trump Entertainment and rights of the Coastal Parties thereunder.

128.    Notwithstanding that knowledge, Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations and John Does 1-100 interfered with the Coastal Parties' contractual rights by causing Trump Marina not to, among other things, (a) maintain the Casino in the condition that existed as of the date of the Agreement, ordinary wear and tear excepted; (b) maintain its key employees and relationships with its customers, including High-Rollers; and (c) perform the work set forth in Section 7.4 of the Seller Disclosure Letter.

129.    Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 acted intentionally and without justification or excuse in connection with their interference with the Coastal Parties' contractual rights, and further acted with actual malice or a wanton and willful disregard of the rights of the Coastal Parties.

130.    The Casino has suffered harm as a result of the improper acts of Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 in the form of lost revenue and good will, and the loss of customers, all of which has caused the Coastal Parties substantial damages.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendants Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 as follows:

a.    For compensatory damages;

b.    For the return of the $15,000,000 Initial Deposit;

c.      For the release of the $2,000,000 Subsequent Deposit to the Coastal Parties;

d.      For consequential and incidental damages;

e.      For punitive damages;

f.      For attorneys' fees and costs; and,

g.      For all other and further relief as the Court deems just and equitable.

## COUNT IX

### (Civil Conspiracy)

131.    They repeat and reallege the allegations set forth in paragraphs 1 through 130 of the Complaint as if set forth at length herein.

132.    Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 entered into an agreement and a conspiracy to commit fraud and to tortiously interference with the Coastal Parties' contractual rights by (a) diverting customers (potential, existing and High Rollers) and key employees from the Casino to other hotels and casinos owned and or controlled by defendants or their affiliates; (b) failing to properly and adequately maintain and invest in the Casino in the usual, regular and ordinary course in substantially the same manner as Trump Marina conducted before the execution of the Agreement and the First Amendment; and (c) failing to use commercially reasonable efforts consistent with past practices to preserve and invest in the Casino.

133.    In furtherance of the unlawful conspiracy, Trump Marina, Trump Entertainment, Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 knowingly and intentionally concealed their

actions from the Coastal Parties and represented to the Coastal Parties that they were in compliance with their obligations under the Agreement and First Amendment.

134.    As a result of the unlawful conspiracy, the Coastal Parties have suffered damages.

135.    The harm suffered by the Coastal Parties was actuated by the bad faith and actual malice of these defendants or their wanton and willful disregard of the rights of the Coastal Parties.

**WHEREFORE**, plaintiffs Coastal Marina and Coastal Development hereby demand judgment in their favor and against defendants Trump Marina, Trump Entertainment**,** Trump, Juliano, Pickus, Burke, Trump Plaza, Trump Taj Mahal, ABC Corporations 1-100 and John Does 1-100 as follows:

    a.    For compensatory damages;

    b.    For the return of the $15,000,000 Initial Deposit;

    c.    For the release of the $2,000,000 Subsequent Deposit to the Coastal Parties;

    d.    For consequential and incidental damages;

    e.    For punitive damages;

    f.    For attorneys' fees and costs; and,

    g.    For all other and further relief as the Court deems just and equitable.

## JURY DEMAND

The Coastal Parties hereby demands a jury on all issues so triable in this

Adversary Complaint.

Dated:  October 21, 2009          /s/ Vincent F. Papalia
                                         Vincent F. Papalia, Esq.
                                         James H. Forte, Esq.
                                         Mark A. Roney, Esq.
                                         **SAIBER LLC**
                                         One Gateway Center, 13th Floor
                                         Newark, New Jersey 07102-5311

                                         **-** and **-**

                                         Michael W. Moskowitz, Esq. (admitted *pro hac vice*)
                                         Ari J. Glazer, Esq. (admitted *pro hac vice*)
                                         **MOSKOWITZ, MANDELL, SALIM**
                                            **& SIMOWITZ, P.A.**
                                         800 Corporate Drive, Suite 500
                                         Fort Lauderdale, Florida 33334

                                         *Attorneys for Coastal Marina, LLC*
                                         *and Coastal Development, LLC*